FILED
2025 Jun-25  AM 11:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ELAINE ADAMS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:23-cv-01540-RDP** |
| | } | |
| **HGC RIVERCHASE, LLC,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Before the court are the Motion for Summary Judgment (Doc. # 46) and Motions to Exclude (Docs. # 48, 49) filed by Defendant HGC Riverchase, LLC ("HGC"). The Motions have been fully briefed. (Docs. # 46, 47, 52, 53, 62; 48, 56, 57, 59, 63; 49, 55, 58, 60, 64). After careful consideration, and for the reasons outlined below, HGC's Motion for Summary Judgment (Doc. # 46) is due to be granted in part and denied in part and HGC's Motions to Exclude (Docs. # 48, 49) are due to be denied.

## I.    Background

This case involves the tragic death of Plaintiff's eighteen-year-old son Reginald Adams ("Adams") who drowned after going down a slide into the pool at the Riverchase Country Club ("RCC") on August 22, 2023. Following the death of her son, Plaintiff filed this action asserting claims of negligence and wantonness against HGC based on theories that the premises were not safe.

The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281

F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

RCC is a private club located in Birmingham, Alabama. (Doc. # 46-27). One of the many amenities RCC offers its members is a swimming pool. (*Id.* at 13). HGC is the company that owns, operates, and controls the premises and pool at RCC. (Doc. # 33 ¶ 2).

The RCC pool is subject to and governed by Shelby County Regulations (the "Regulations"). (Docs. # 52-1 at 6-7, 10; 46-7 at 12). The Regulations classify the pool at RCC as a Class A public pool with a surface area of greater than 4,000 square feet of water. (Doc. # 28-3). The specific Regulations that are relevant to the RCC pool are the following:

> (8) Operations and Maintenance.
>
> . . .
>
>> (g) Lifesaving Equipment. Public Pool Classes A, B, and C shall be provided with the lifesaving equipment 1, 2, and 3 below. Such lifesaving equipment shall be visually conspicuous and conveniently located at all times.
>>
>>> 1. Accessory pole. A swimming pool accessory pole not less than 12 feet in length and including a body hook shall be provided.
>>>
>>> 2. Throwing Rope. A throwing rope attached to a ring buoy or similar flotation device shall be provided. . . .
>>>
>>> 3. Rope Float and Line. . . .
>>
>> (h) Lifeguard Chair.
>>
>>> 1. [] Swimming pools with 4,000 square feet or more of water surface area shall be provided with at least two elevated lifeguard platforms or chairs, such that there shall be at least one elevated lifeguard platform or chair for every 2,500 square feet or major fraction thereof of water surface area.
>>>
>>> 2. The elevated lifeguard platforms or chairs shall be located as to provide a clear, unobstructed view of the bottom of the swimming pool in the area under surveillance. All chairs must be manned

2

> during hours of operation with a certified person trained in
> lifesaving by the American Red Cross or equivalent program.

(Doc. # 46-22 at 22-23).

HGC certified that it would comply with "all the provisions of the Shelby County [Regulations]" when it applied for a permit to operate the RCC pool. (Docs. # 46-2 at 13, 46; 46-23 at 8).

Three months before the incident at issue, on May 10, 2023, the Shelby County Health Department performed an inspection of the RCC pool area and certified that all the required safety equipment was present. (Doc. # 46-23 at 6). Once again, the required safety equipment includes (1) an "accessory pole not less than 12 feet in length and including a body hook"; (2) a "throwing rope attached to a ring buoy or similar flotation device"; and (3) a "rope float and line." (Doc. # 46-22 at 23).

Throughout August 2023, the RCC pool was maintained weekly. (Doc. # 46-15 ¶ 3).  This included weekly cleanings (*id.*); however, the parties dispute whether this included safety checks. (*See* Docs. # 47 ¶ 4; 53 ¶ 4).

On August 15, 2023, RCC informed its members via a Facebook post that the RCC pool would be "SWIM AT OWN RISK" on certain days, including Tuesday, August 22, 2023, the day of the incident. (Doc. # 46-28 at 3-4). "SWIM AT OWN RISK" meant there would be no lifeguards on duty at the pool. (*Id.*). In addition to notifying its members that the pool would be "SWIM AT OWN RISK," RCC also installed warning signs on the pool entry gate and interior pool fence that read the following: "WARNING NO LIFEGUARD ON DUTY." (Doc. # 46-23 at 4).

At or around 4:00 p.m. on August 22, 2023, Adams arrived at the RCC pool with several of his friends who were all guests of another friend and an RCC member, John McPhearson ("McPhearson"). (Docs. # 46-9 at 8; 46-10 at 10). Adams was eighteen years of age on the day of

the incident. (Doc. # 28 ¶ 1). Plaintiff testified that Adams knew how to swim and that before the incident she had seen him tread water and jump into the deep end of a pool – that is, circumstances where he had to keep himself afloat or swim. (Doc. # 46-1 at 9).

As the RCC Facebook post and the sign at the pool that day had indicated, there were no lifeguards on duty that day. (Docs. # 46-5 at 23; 46-6 at 21; 46-8 at 25). The Rule 56 evidence indicates the sign was displayed at the pool that day. A bystander who witnessed the incident testified that on that day, August 22, 2023, she saw the sign on the pool entry gate that warned there were no lifeguards on duty. (*Id.*). Additionally, two of Adams's friends testified that they saw the signs warning that there were no lifeguards on duty. (*See* Docs. # 46-8 at 13, 25; 46-11 ¶ 8; 46-26 ¶ 3). Those two friends also testified that when they saw the sign at the entrance of the pool, someone read it out loud. (Docs. # 46-8 at 25; 46-11¶ 8). The court acknowledges that one of Adams's friends testified that he did not remember[1] seeing the signs at the pool that day, but he knew there were no lifeguards at the pool because he did not see any when he entered the pool area. (Docs. # 46-9 at 9, 18; 46-12 ¶ 11).

Shortly after entering the pool, Adams and his friends walked toward the deep end of the pool. (Doc. # 46-26 ¶ 4). The RCC pool has a water slide in the corner of the deep end that is located immediately next to an unobstructed lifeguard chair. (Doc. # 46-24 at 8). There also is a "12 ft" tile marker at the deep end of the pool, signifying that the deep end is twelve feet deep. (*Id.* at 9-11). One of Adams's friends testified that he noticed there was not a lifeguard in the chair near the deep end on the day of the incident. (Doc. # 46-8 at 25).

---

[1] To be clear, there is no testimony in the Rule 56 record that the sign was not displayed that day. If one witness (or, for that matter, even if more than one witness) were to say they do not <u>recall</u> the sign up is not evidence it was not displayed, particularly given that others saw it.

After getting to the deep end, Adams and his friends began going down the slide into the pool. (Doc. # 46-26 ¶ 4). McPhearson traveled down the slide first. (*Id.*). After McPhearson went down the slide and climbed out of the pool, Adams went down the slide feet first on his back. (*Id.* ¶ 5; *see also* Docs. # 46-8 at 15; 46-12 ¶ 3). Adams's friends did not notice anything unusual about how he entered the water. (Doc. # 46-8 at 15). Some of Adams's friends observed that once below the surface of the water, Adams appeared to be moving his arms underwater. (Doc. # 46-26 ¶ 5). One of Adams's friends, Julian Duff ("Duff"), stated that Adams "did not immediately come to the surface, but I thought he was holding his breath and purposely staying underwater, which is something I had seen him do numerous times before." (Doc. # 46-12 ¶ 3).

After approximately one to two minutes, Adams's friends grew concerned that Adams was not swimming back to the surface. (*Id.* ¶ 4; Docs. # 46-9 at 10; 46-26 ¶ 6). Duff testified that around that time, he dove into the pool and grabbed Adams's arm, but Adams did not respond. (Docs. # 46-12 ¶ 5; 46-9 at 10). After Adams's friends made four attempts to pull him to the surface, they called out to bystanders at the other end of the pool for help. (Doc. # 46-9 at 10-11).

After several more failed rescue attempts to bring Adams to the surface, bystander Matt Stephens ("Stephens") pulled Adams from the pool with the help of two of Adams's friends. (Docs. # 46-6 at 14; 46-10 at 11). Stephens testified that he got a "catch pole, a long retrieval pole . . . off the wall" to use to pull Adams out of the pool. (*Id.*).

According to Plaintiff's medical expert Dr. Justin Sempsrott ("Dr. Sempsrott"), Adams was submerged underwater for an estimated five minutes. (Doc. # 46-19 at 21-22).

Around the time that Adams was being pulled out of the water, a bystander called 911 at 4:44 p.m. (Doc. # 46-10 at 12). Once Adams was pulled from the water, bystanders immediately performed CPR, *i.e.*, chest compressions and ventilations. (Docs. # 46-9 at 11; 46-13 ¶ 3; 46-8 at

19; 46-4 at 12). Those CPR efforts continued until the Hoover Fire Department arrived and emergency responders took over CPR. (Doc. # 46-9 at 12). It took the emergency responders between six and thirteen minutes to arrive at the RCC pool after the bystander called 911. (*See* Docs. # 46-10 at 12; 46-21 at 10; 46-20 at 3).

Sometime after arriving on the scene, the Hoover Fire Department transported Adams to the University of Alabama at Birmingham Hospital ("UAB"). (Doc. # 46-20 at 5). Adams arrived at the hospital at 5:34 P.M. (*Id.*).

The next day, August 23, 2023, Adams died from an anoxic brain injury. (Docs. # 46-17 ¶ 3; 46-16 ¶ 4). The UAB Death Note stated that there were no "potentially confounding conditions, including toxic and metabolic disorders, significant doses of [central nervous system]-depressing medications, alcohol, paralytic agents, hypothermia, shock, or surgically remediable conditions" that contributed to Adams's death. (Doc. # 52-4). The coroner who reviewed Adams's medical records and performed a physical examination of Adams determined that the injury was "caused by a lack of oxygen to [Adams's] brain for a prolonged period" and "[n]o other internal or external injuries contributed to [his] death." (Doc. # 46-16 ¶ 4).

Plaintiff filed her initial Complaint on November 13, 2023. (Doc. # 1). Subsequently, HGC filed a Motion to Dismiss (Doc. # 4), which the court granted in part. (Docs. # 22, 23). The court dismissed Plaintiff's negligence per se claim and dismissed the Complaint as a whole for being an impermissible shotgun pleading. (Doc. # 23). However, the court allowed Plaintiff to file an amended complaint, which she did on June 11, 2024. (Doc. # 28). The parties engaged in discovery on the allegations in the amended complaint and these dispositive motions followed.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support

each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III.    Analysis

Plaintiff's Amended Complaint asserts the following claims: (Count One) negligence and (Count Two) wantonness. (Doc. # 28). Plaintiff alleges that pursuant to the Shelby County Regulations, HGC owed Adams a duty to provide lifeguards and safety equipment at the RCC pool and that HGC negligently and wantonly breached this duty. (*Id.*). HGC argues that it is entitled to summary judgment on both Plaintiff's negligence claim and her wantonness claim. (Doc. # 47).

### A.    Negligence Claim

#### i.    Lack of Lifeguards

To establish a negligence claim under Alabama law, a plaintiff must show: "(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury."

*Lemley v. Wilson*, 178 So. 3d 834, 841 (Ala. 2015) (internal quotation marks omitted). Generally, in premises liability actions like this one, "[t]he owner of a premises owes a duty to business invitees to use reasonable care and diligence to keep the premises in a safe condition, <u>or</u>, if the premises are in a dangerous condition, to give sufficient warning so that, by the use of ordinary care, the danger can be avoided." *Armstrong v. Ga. Marble Co.*, 575 So. 2d 1051, 1053 (Ala. 1991) (emphasis in original).

HGC admits that generally a premises owner owes a duty to invitees on its premises (such as Adams). However, it argues that this duty is obviated as "'the owner of a [a] premises has no duty to warn an invitee of open and obvious defects in the premises which the invitee is aware of or should be aware of in the exercise of reasonable care.'" (Doc. # 47 at 13 (citing *Tice v. Tice*, 361 So. 2d 1051, 1052 (Ala. 1978)). HGC further argues that under Alabama law, the lack of a lifeguard is an open and obvious condition as a matter of law. HGC cites two Alabama Supreme Court cases to support this contention: *Alabama Farm Bureau Mutual Casualty Insurance Company v. Hixon*, 533 So. 2d 518 (Ala. 1988) and *Alabama Power Company v. Dunaway*, 502 So. 2d 726 (Ala. 1987). In *Hixon* and *Dunaway*, the Alabama Supreme Court held that there is no duty to provide a lifeguard because whether a lifeguard is present is a condition that could be easily discovered and is therefore open and obvious, precluding any duty on behalf of a premises owner. *See Hixon*, 533 So. 2d at 520 ("There is no absolute duty to provide a lifeguard or other supervision at a swimming pool. The lack of a lifeguard is a condition that could have been discovered by reasonable and customary inspection, and no liability will be imposed on the defendant for failing to provide a lifeguard."); *Dunaway*, 502 So. 2d at 728 ("The lack of lifeguards is a condition which could have been discovered by [the] invitees by their reasonable and customary inspection.").

Plaintiff agrees that an open and obvious condition may be a compete defense to a premises owner's duty to protect against a hazard on the premises. But, she contends that this is only a defense to a premises owner's "general duty" – it is not a complete defense where a premises owner owes a "special duty." (Doc. # 53 at 19). Plaintiff argues that HGC owed Adams a "special duty" under the applicable Shelby County Regulations, which imposed certain safety requirements on the RCC pool.

Plaintiff points to the Alabama Supreme Court case *Lands v. Ward*, 349 So. 3d 219 (Ala. 2021) and argues that the Regulations define the special duties that were owed in this case. In *Lands v. Ward*, a commercial truck driver was injured when the truck he was driving rolled over him even though the truck was in neutral gear and the parking brake was on. *Id.* at 221. The driver brought an action against the entity that owned the truck alleging claims of negligence and wantonness. *Id.* at 222. The driver asserted that the entity "had a duty under statute, regulation, and common law to inspect the truck and maintain it in [a] safe condition" and by failing to inspect it and maintain it, the truck "fell into disrepair" and caused his injuries. *Id.*

The Alabama Supreme Court considered whether the driver could rely on federal regulations and an Alabama statute to establish the duty element of his prima facia case of negligence. The court held that he could: "In a negligence action, it is possible for a legal duty imposed by statute or regulation to inform the common-law standard of reasonable care or to supplant it entirely." 349 So. 3d 219, 223 (Ala. 2021) (citing *Parker Bldg. Servs. Co. v. Lightsey ex rel. Lightsey*, 925 So. 2d 927, 930-31 (Ala. 2005)). "'A violation of a [safety] statute or ordinance can, therefore, be evidence of negligence under certain circumstances.'" *Id.* (quoting *Murray v. Ala. Power Co.*, 413 So. 2d 1109, 1114 (Ala. 1982)) (alteration in *Lands*). As the court explained, "[t]his [principle] is not to be confused with the doctrine of negligence per se" because

while negligence per se involves "using a statutory violation to conclusively establish, as a matter of law, duty and breach[,]" a general negligence claim involves relying on a "statute to make out a prima facie case of negligence." *Id.* at 223 n.1 (citations omitted).

Based on the Alabama Supreme Court's holding in *Lands*, the court concludes that the Shelby County Regulations impose a duty on HGC. Related to lifeguards, the Regulations state in relevant part:

> (h) Lifeguard Chair.
>
>> 1. . . . Swimming pools with 4,000 square feet or more of water surface area shall be provided with at least two elevated lifeguard platforms or chairs, such that there shall be at least one elevated lifeguard platform or chair for every 2,500 square feet or major fraction thereof of water surface area.
>>
>> 2. The elevated lifeguard platforms or chairs shall be located as to provide a clear, unobstructed view of the bottom of the swimming pool in the area under surveillance. **All chairs must be manned during hours of operation with a certified person trained in lifesaving by the American Red Cross or equivalent program.**

(Doc. # 46-22 at 23) (emphasis added).

HGC denies that it owed Adams a "special duty" under the Shelby County Regulations. (Doc. # 62 at 4). It argues that "a regulation only supplants common law in the negligence per se context[]" (*id.* at 6) and that Plaintiff's reliance on *Lands* is "misguided" because the case "involved that which is not present here – a regulation that had been interpreted to protect a class of persons distinct from the general public." (*Id.* at 7 (citing *Lands*, 349 So. 3d at 224)). But, HGC actually cited *Lands* in its Motion for Summary Judgment when discussing how compliance with the Shelby County Regulations regarding the required safety equipment "satisfies the duty requirement under Alabama law." (Doc. # 47 at 20; *see also id.* (citing *Lands*, 34 So. 2d at 223 ("stating in a negligence action it is possible for a legal duty imposed by statute or regulation to inform the common-law or supplant it entirely"))). Based on the court's own

11

reading of *Lands*, the court concludes that a regulation may provide the basis for a duty in the negligence context, not just in the negligence per se context.

Alternatively, HGC argues that even if it did have a duty under the Regulations, the lack of lifeguards was still an open and obvious condition that obviates any such duty. (Doc. # 47 at 15). HGC contends that a reasonable person in Adams's position would have observed that there were no lifeguards at the RCC pool on the day of the incident; therefore, the condition was open and obvious so as to preclude any duty imposed on HGC. (*Id.* at 15-19). However, the court is not convinced that the open and obvious affirmative defense applies when there is a specific regulation in place. Caselaw is clear that in a general premises liability action, a premises owner may rely on the defense to obviate a duty. *See Owens v. Ganga Hosp., LLC*, 352 So. 3d 1172, 1175 (Ala. 2021); *Quillen v. Quillen*, 388 So. 2d 985, 989 (Ala. 1980); *McClurg v. Birmingham Realty Co.*, 300 So. 3d 1115, 1118-19 (Ala. 2020). But, the court has not found, nor has HGC cited any case where courts have concluded that the defense can be used when there is a regulation imposing the duty owed by a premises owner. Furthermore, even if the affirmative defense did apply in this context, the Alabama Supreme Court has held that "[q]uestions of openness and obviousness of a defect or danger . . . are generally not to be resolved on a motion for summary judgment." *McClurg*, 300 So. 3d at 1119 (citing *Ex parte Kraatz*, 775 So. 2d 801, 804 (Ala. 2000) (in turn quoting *Harding v. Pierce Hardy Real Est.*, 628 So. 2d 461, 463 (Ala. 1993))).

After careful review of the Regulations, the court concludes that HGC had a duty to have lifeguards in the lifeguard chairs "during hours of operation." (Doc. # 46-22 at 23). The applicable Regulations do not include any exception to the lifeguard requirement or outline an alternative to having lifeguards for pools that are covered by the applicable law. Further, this duty is not obviated by the open and obvious affirmative defense. Considering the Rule 56 record, it is undisputed that

12

there were not lifeguards at the pool on the day of the incident. (Docs. # 46-5 at 23; 46-6 at 21; 46-8 at 25). HGC had a duty to have lifeguards at the pool, but it did not; it follows that HGC breached its duty under the Regulations.

The third element of a negligence claim – whether the lack of lifeguards at the pool proximately caused Adams to drown – is a question for a jury to consider. Under Alabama law, it is "well established that the question of proximate causation is almost always a question of fact to be determined by the jury." *Lemond Constr. Co. v. Wheeler*, 669 So. 2d 855, 862 (Ala. 1995); *see also Giles v. Gardner*, 249 So. 2d 824, 826 (Ala. 1971) ("Generally speaking, proximate cause is a jury question."). "It is only when the facts are such that reasonable [jurors] must draw the same conclusion that the question of proximate cause is one of law for the courts." *Western Ry. of Ala. v. Still*, 352 So. 2d 1092, 1095 (Ala. 1977).

It is undisputed that Adams drowned in HGC's pool, that there were no lifeguards at the pool on the day that Adams drowned, and that Adams did not suffer from any pre-existing physical conditions or limitations and was not impaired at the time of his death. (Docs. # 52-4; 46-16 ¶ 4). However, whether the *lack* of lifeguards *caused* Adams to drown is a question on which reasonable minds could differ. Therefore, that question must be submitted to a jury.

For all of these reasons, HGC's motion for summary judgment on Plaintiff's negligence claim related to the lack of lifeguards is due to be denied.

### ii.     Lack of Safety Equipment

In addition to the requirement to have lifeguards at the pool, Plaintiff also argues that the Shelby County Regulations "required HGC to provide a 12-foot or longer accessory pole that included a body hook" and "[t]hat regulation imposed a special duty concerning safety equipment, independently of any common law duties applicable to HGC." (Doc. # 53 at 24). HGC admits that

the Shelby County Regulations required the RCC pool to have an accessory pole "not less than 12 feet in length and including a body hook" but it contends that the undisputed evidence on this shows that it complied with that Regulation. (Doc. # 47 at 20). The court agrees.

Three months before the incident, the Shelby County Health Department performed an inspection of the RCC pool area and certified that all the required safety equipment was present. (Doc. # 46-23 at 6). There is no evidence in the Rule 56 record to suggest that the accessory pole was removed or altered in between that inspection and the date of the incident. (*See also* Doc. # 46-2 at 39 (HGC's 30(b)(6) deponent testifying that the safety equipment did not change from May 10 to August 22)). Plaintiff merely points to the testimony of three bystanders who offered estimates as to the length of the pole to argue that the pole was not in fact twelve feet long. (*See* Doc. # 53 at 5 (citing Doc. # 46-4 at 17; 46-5 at 15; 46-6 at 15)). However, none of these bystanders could definitively testify as to how long the accessory pole actually was. (*See* Doc. # 46-4 at 17 (bystander testifying that he did not know how long the accessory pole was); 46-5 at 15 (when asked how long the pole was, the bystander answered "I mean, it's pretty darn long. Six, seven feet. . . . I don't know. . . . I'm not good with measurements either."); 46-6 at 15 (testifying that the pole was "much longer" than six feet)).

Thus, Plaintiff has not presented competent evidence that the accessory pole was not twelve feet in length and has not created a genuine question of fact on this issue. That is, she has not pointed to any evidence or testimony to suggest that the pole was shorter than twelve feet. These bystanders merely guessed at the length of the pole. This so-called evidence is not even "colorable," much less "significantly probative." *Anderson*, 477 U.S. at 249. Therefore, HGC's motion for summary judgment as to this claim is due to be granted.

### B.    Wantonness Claim

Alabama law defines wantonness as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code § 6-11-20(b)(3). "Wantonness is qualitatively different from 'negligence' and involves the conscious doing of some act or omission of some duty while knowing of the existing conditions <u>and</u> being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Armstrong v. Hill*, 290 So. 3d 411, 418 (Ala. 2019) (quoting in part *Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007) (some internal quotation marks omitted) (emphasis in original)).

Although HGC failed to comply with the requirement to have lifeguards present at the pool, there is evidence in the Rule 56 record that it specifically warned patrons that there were no lifeguards present and that they were to swim at their own risk. (Doc. # 46-23 at 4). Under these undisputed facts, HGC did not recklessly disregard the safety of swimmers. That is, it did not consciously perform some act or omission knowing that such a failure would likely cause or result in injury. *Armstrong*, 290 So. 3d at 418. *See also Harper v. Janssen Pharms., Inc.*, 2018 WL 2691492, at *12 (M.D. Ala. Apr. 4, 2018) (dismissing the plaintiff's wantonness claim because although the defendant's warning "could have been broader or stronger[,]" it did not "equate to reckless disregard or an indifference toward safety"). Therefore, HGC's motion for summary judgment as to Plaintiff's wantonness claim is due to be granted.

## IV.    HGC's Motions to Strike

HGC filed motions to strike two of Plaintiff's experts: Dr. Thomas Griffiths and Dr. Sempsrott. (Docs. # 48, 49). Because the court did not consider Dr. Griffiths's and Dr. Sempsrott's opinions in analyzing HGC's Motion for Summary Judgment (Doc. # 46), HGC's Motions to Strike (Doc. # 48, 49) are due to be denied as moot.

**V.    Conclusion**

For the reasons discussed above, HGC's Motion for Summary Judgment (Doc. # 46) is due to be granted in part and denied in part, and HGC's Motions to Exclude (Docs. # 48, 49) are due to be denied as moot. An order reflecting this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this June 25, 2025.

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE